IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES BROADWAY,                           No   C-03-5733 VRW (PR)

       Petitioner                        ORDER

       v

CK PLILER, Warden,

       Respondent.
_____/

       On July 15, 1996, petitioner James Broadway ("Broadway") was convicted by a jury in the Superior Court of the State of California in and for the County of Santa Clara ("superior court") of one count of first degree attempted murder and two counts of assault with a firearm.  Doc #25 (Respondent CK Pliler ("Pliler") Opp) at 2.  The jury found further that Broadway committed the crimes for the benefit of a criminal street gang.  On January 9, 1997, the superior court sentenced Broadway to a total state prison term of 17 years to life – an indeterminate term of 15 years to life for attempted murder; a determinate term of three years for

//

1 the assault counts running concurrently; and a two-year street gang
2 enhancement.  Id.

3       On May 12, 1999, the California Court of Appeal, Sixth
4 Appellate District ("court of appeal") issued an order to show
5 cause returnable in the superior court on Broadway's petition for a
6 writ of habeas corpus.  Ex D4 ("Order to Show Cause").
7 Specifically, Broadway claimed that the prosecution withheld
8 "favorable and material impeachment information."  Id.

9       On July 16, 1999, the court of appeal affirmed the
10 superior court's conviction on direct appeal.  Ex B12 ("App Ct
11 Affirm") at 30.  The court of appeal, however, modified Broadway's
12 term to 15 years to life because it found that Cal Penal Code §
13 186.22(b) did not allow a gang enhancement term to be added to a 15
14 years to life prison sentence.  Id.  The California Supreme Court
15 denied Broadway's petition for review on October 22, 1999.

16       On November 17, 2000, after holding a hearing pursuant to
17 the court of appeal's order to show cause, the superior court
18 rejected Broadway's habeas corpus petition claim that the
19 prosecution failed to disclose favorable evidence.  Ex C5
20 ("Superior Ct Rej").  The court of appeal and California Supreme
21 Court denied Broadway's habeas corpus petition on April 8, 2002,
22 and November 13, 2002, respectively.

23       Broadway filed a federal petition for a writ of habeas
24 corpus under 28 USC § 2254 on December 18, 2003, Doc #1 ("Broad
25 Pet"), and an amended petition on May 26, 2004, Doc #9 ("Broad
26 Amend Pet").  After this court issued an order to show cause, Doc
27 #10, Pliler filed an answer, Doc #24, and opposition memorandum,
28 //

Doc #25 ("Pliler Opp"), on April 28, 2005. Broadway did not file a traverse.

I

The court of appeal summarized the facts of the case as follows:

> On January 27, 1996, Andre Smith, Tiagmal "Maurice" Bagsby and Fred Gordon attended a talent show at San Jose's Independence High School (IHS). Smith is a member of the Cartel Crips gang (CC) previously known as C-Mob. There was evidence that Bagsby and Gordon were Crips "wannabes" who associated with Crips, and Bagsby acknowledged he had heard of the CC and Family Gangster Crips (FGC).
>
> As Bagsby, Gordon and Smith left the show between 10 and 11:30 pm, Bagsby got into a verbal confrontation with defendant Broadway, who was standing by a Cutlass automobile parked near a dark mini-van. Defendants Broadway, Williams, Tyson, and Holmes, who were part of a group standing near those two vehicles, were identified as members of Mount Pleasant Hoods (MPH), a Blood gang. Once a member of the Crip gang C-Mob, Broadway had "flip-flopped" to MPH.
>
> As he passed within approximately 25 feet of the group, Bagsby heard Broadway say, "that's the little crab, Maurice." Bagsby, who knew "crab" was a "derogatory" term used by Bloods to disrespect Crips, asked if Broadway "had a problem," because he felt Broadway's comment had been made in a way that challenged a fight. Gordon and Smith overheard the derogatory term directed towards Bagsby, and Smith reported that he also heard people within Broadway's group saying "MP Hood" and "Blood." Smith thought Bagsby "was getting into it with the slobs [derogatory term for a Blood]."
>
> After his verbal interaction with Broadway, Bagsby saw Holmes open the Cutlass trunk and start "digging for something" inside it. Bagsby backed up and fearfully told Gordon and Smith that "we got some funk," which meant "something [was] about to happen." Bagsby testified Broadway looked like he wanted to fight, and Gordon said it was "like a stare down." Holmes, Tyson, and Williams entered the Cutlass as Broadway got into its driver's seat. The Cutlass then exited the IHS gate and turned right onto Jackson Avenue.

3

Bagsby, Gordon and Smith walked out the same gate and turned right. They then saw the Cutlass return on the opposite side of Jackson, "flying down the street" at over 30 miles per hour with somebody shooting at them from the car. While someone shouted something about "MP Hoods," two shots were fired from the driver's side window. Bagsby testified the shots could have come from the back seat. As Bagsby, Gordon and Smith ran and ducked, Smith was shot in the leg. Bagsby and Gordon helped Smith to Bagsby's home across the street from the back side of IHS. Bagsby then called 911. That night, Bagsby told Officer Lee that the car involved in the shooting had "slowed down" before the shots were fired towards the sidewalk near the IHS parking lot. Smith testified he did not know who fired the shots but he earlier had said either Williams or Broadway was the shooter because "when [he] got shot, [he] [had] seen [Williams's] car."

Ameena Wilson, a Blood gang associate and friend of Tyson, was with defendants in the IHS lot after the show with Monica Mitchell, who was a friend of Holmes. Wilson, who was driving her mother's burgundy mini-van, did not see any altercation involving defendants that night. After defendants left the lot, she and Mitchell drove to Tyson's house to visit him. Holmes also was there. The girls stayed about an hour and then left with Holmes. Mitchell, who said she did not see or hear anything regarding a shooting near IHS that night, acknowledged that calling someone believed to be a Crip a "crab" would constitute "fighting words."

Sometime after 11:30 pm, Officer Morales of San Jose's Violent Crime Enforcement Team located the maroon mini-van reported to be associated with the IHS shooting in front of Tyson's house. The van was kept under surveillance until it left Tyson's street about an hour later. At that point, Officer Chrisman stopped the van and identified Wilson as the driver. There was a second female in front, and Holmes was in the rear. Chrisman searched the van and found a loaded, .25 caliber handgun underneath an infant seat next to Holmes.

Smith testified Tyson was a member of MPH, that he and Tyson were enemies, and that Broadway used to be in the Crip "hood" to which Smith belongs. Prior to the shooting, Smith had been involved in a fight with Williams. Smith said he fought with Williams at that time because he was drunk and because Williams is "a slob," i.e., "a Blood. The opposite, the other side" from being a Crip, which is what Smith was.

Detective Dunson, the lead investigator on this case and an expert in African American San Jose street

4

gangs, specifically the Bloods and Crips, testified there is a "longtime rivalry" between the Bloods and the Crips and that this IHS drive-by shooting occurred due to a rivalry between the Blood MPH members and the CC, FGC, and Seven Tree Crips (STC). Dunson said this rivalry particularly involved Smith and Williams and that this IHS shooting was motivated in part by Smith's having "disrespected" Williams in front of Williams's girlfriend and relatives as well as by the confrontation in the IHS parking lot. Dunson opined that the shooting was committed for the benefit of, and in association with, members of the MPH Blood gang, for "reputation and retaliation," to promote, further and assist that gang's criminal conduct. He identified Tyson, Holmes, and Broadway as "hard core" MPH members, and noted that Williams was an MPH associate. Dunson identified Smith as a CC member, and Bagsby and Gordon as associates of STC and FGC.

Both Dunson and Detective Boyd, another criminal street gang expert, testified to previous altercations involving MPH and San Jose Crips gangs. They described (1) a September 1992 Crip party, during which a group of MPH members drove by and shot towards the residence, striking a female Crip associate several times, (2) a subsequent act of witness intimidation in which a male who saw the shooting at the 1992 party and his girlfriend were intimidated by MPH members, (3) a May 1994 incident in which MPH members shot at a Crip and yelled Blood slogans and (4) a June 1994 "payback" homicide committed by Crips, in which Crips were chased and killed someone they erroneously believed was an MPH member.

Dunson interviewed Smith, Bagsby, and Tyson. Smith believed it was the driver who had shot from the Cutlass. Bagsby said he was arguing with Broadway, and he saw Broadway drive the Cutlass out of the IHS lot. Tyson admitted he was an MPH member and described previous altercations between MPH and FGC.

A week after the shooting, Williams came to the police station and was interviewed by Dunson. Williams said he saw the confrontation in the IHS lot on January 27[, 1996]. He said someone else drove his Cutlass out of the lot but had pulled over and switched positions with Williams, who had been the front passenger. Williams was driving northbound on Jackson toward IHS trying to get to the freeway when he heard two shots fired from the rear of the car. Williams consented to a search of his Cutlass; on the front passenger seat floorboard Dunson found a .38 caliber shell casing similar to a .38 shell casing that had been found shortly after the shooting on the median across from IHS.

5

> When Dunson interviewed Broadway, Broadway admitted getting into a confrontation with Bagsby in the IHS lot. Broadway said when Holmes went to get a "deuce five" or "twenty-five caliber" handgun in the trunk, he felt "it was a good time to leave," so he jumped into the driver's seat of the Cutlass and drove out of the lot. He had the keys to the Cutlass because he had driven it to IHS. Broadway said he "thought he was too drunk to drive" so he had pulled over and someone else started driving. As they drove past the school, he heard two shots being fired and ducked down in the car.

App Ct Affirm at 3-7 (footnotes omitted).

II

A federal writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 USC § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v Taylor, 529 US 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

//

6

principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id at 409.

The only definitive source of clearly established federal law under 28 USC § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id at 412; Clark v Murphy, 331 F3d 1062, 1069 (9th Cir 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

III

In his federal amended petition for writ of habeas corpus, Broadway claims (1) that the prosecution failed to disclose favorable and material evidence to Broadway before trial and (2) that Broadway was denied his right to effective assistance of counsel during pretrial and trial stages. Broad Amend Pet at 6.

The court addresses each claim in turn.

7

**A**

In <u>Brady v Maryland</u>, 373 US 83 (1963), the Supreme Court established the standard for determining whether the prosecution's failure to disclose evidence violated a petitioner's constitutional rights. The Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 US at 87. The Court subsequently made clear that the duty to disclose such evidence applies even if there has been no request by the accused, <u>United States v Agurs</u>, 427 US 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, <u>United States v Bagley</u>, 473 US 667, 676 (1985). The Court also clarified that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id at 682.

In sum, there are three components to a <u>Brady</u> violation: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." <u>Strickler v Greene</u>, 527 US 263, 281-82 (1999).

In the instant case, Broadway claims that the prosecution failed to disclose material evidence concerning a pending civil lawsuit filed by co-defendant Terrence Tyson ("Tyson") against the San Jose Police Department ("police department") for excessive use

of force against Tyson and his father ("Tyson's lawsuit").  Broad Amend Pet, Claim 1 at ¶ 1.  Broadway argues that the prosecution and investigators were or should have been aware of this lawsuit, considering that Tyson was "one of the [main] suspects that was possibly the gunman in the criminal matter."  Id at ¶ 3.  Broadway states that Tyson's defense counsel "inexplicably removed himself as counsel" during the trial, and Tyson proceeded without counsel through the remainder of trial.  Id at ¶ 4.

Furthermore, Broadway asserts that after Tyson's conviction was overturned by an appeals court, the Santa Clara County district attorney's office dismissed criminal charges against Tyson, "due to a possible settlement agreement made between Tyson and the Police Department, which was not disclosed to petitioner or his counsel."  Id at ¶ 5.  Broadway contends that had the prosecution disclosed information about Tyson's pending lawsuit, Broadway or his counsel "may have discovered favorable evidence concerning the San Jose Police Department possibly targeting [Broadway] and some of his friends to remove from society based on allege[d] gang affiliation."  Id at ¶ 6.

Broadway is not entitled to relief on this claim because the superior court's decision finding no violation of Broadway's due process rights was a reasonable application of Brady.  28 USC § 2254(d).  Following a hearing pursuant to the court of appeal's order to show cause, the superior court determined that "the impeachment value of the new evidence is so minimal that it would not have made any difference whatsoever."  Superior Ct Rej at 3. The superior court found that because "[m]ost of the state witnesses did not even know about the lawsuit[,] * * * it could not

9

have even arguably impacted their credibility or have been a source of bias." Id. Specifically, the superior court found that there was no proof that Officer Dunson, the lead investigator in the instant case, knew about the Tyson's lawsuit. Id. Dunson's testimony was "more favorable" to Tyson, who was "the most likely target of bias," than to the other defendants. The superior court concluded that because Dunson was not biased against Tyson, it would not have appeared to the jury that Dunson was biased against Broadway. Id.

The superior court found further that although Officer Boyd – the other officer who testified in Broadway's trial – appeared to have been aware of Tyson's lawsuit, this knowledge "had no influence" on Boyd's testimony. Id. Boyd explained that lawsuits alleging police misconduct are not uncommon and are generally "never taken at face value by the officers named or the rest of the department." Id at 3-4. Boyd was not personally named in the lawsuit and "did not know enough about it to fear it had any merit." Id at 4. The superior court found Boyd a credible witness and concluded: "it appears highly unlikely that [Boyd's knowledge of Tyson's lawsuit] actually caused any bias or that it would appear to a jury to be a real source of bias." Id. In sum, the superior court concluded that because the evidence of Tyson's lawsuit was of "marginal significance," it did not prejudice Broadway that the evidence was unavailable to him. Id.

Section 2254(e)(1) provides that in ruling on a federal petition for writ of habeas corpus, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of

10

correctness by clear and convincing evidence." 28 USC § 2254(e)(1) (emphasis added).

The superior court's determination that any knowledge that witnesses had of Tyson's lawsuit did not undermine their credibility or serve as a source of bias to the jury is entitled to a presumption of correctness, which Broadway does not rebut. See id. Consequently, the superior court's conclusion that there was no reasonable probability that the disclosure of this evidence would have resulted in a different outcome cannot be said to be objectively unreasonable. See 28 USC § 2254(d).

Broadway's assertions that Tyson proceeded without counsel during trial and later "possibl[y]" entered into a settlement agreement with the police department do not compel a different result. These assertions provide no evidence supporting Broadway's claim that the police department was "possibly targeting [Broadway] and some of his friends to remove from society based on allege[d] gang affiliation." Broad Amend Pet, Claim 1 at ¶ 6.

Broadway is not entitled to federal habeas relief on his Brady claim.

B

In order to prevail on an ineffective assistance of counsel claim, petitioner must establish two things. First, petitioner must establish that counsel's performance was deficient, ie, that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland v Washington, 466 US 668, 687-88 (1984). Second, petitioner must establish that he was prejudiced by counsel's deficient performance, ie, that "there

11

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id at 694.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome.  Id.

Broadway claims that he received ineffective assistance of counsel because trial counsel (1) did not investigate or challenge the criminal street gang enhancement allegation filed against Broadway; (2) did not file a motion to suppress "prejudicial and inflammatory evidence" evidence at trial concerning Broadway's gang activity; and (3) did not file any written or verbal motions to dismiss the allegations of assault with a firearm and possession of a firearm.  Broad Amend Pet, Claim 2 at ¶ 4,5,7.

Although it appears that Broadway's ineffective assistance of counsel claims have not been exhausted, they are clearly without merit.

The court addresses each in turn.

1

Broadway first claims that his counsel "never hired an investigator to investigate into [Broadway's] social background" to challenge the prosecution's allegations that Broadway was a gang member within the meaning of Cal Penal Code § 186.22(b).  Broad Amend Pet, Claim 2 at ¶ 4.  Broadway asserts that he "is not and was not a member of any street gang" and that his family member and neighborhood friends could have been called as witnesses to support this contention.  Id at ¶ 5.

//

**12**

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. See <u>Strickland</u>, 466 US at 691. <u>Strickland</u> directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" <u>Silva v Woodford</u>, 279 F3d 825, 836 (9th Cir 2002) (quoting <u>Strickland</u>, 466 US at 491).

The Ninth Circuit has held that to establish that counsel was ineffective for failing to produce a witness at trial, a habeas petitioner must provide "evidence that this witness would have provided helpful testimony for the defense," such as an affidavit from the alleged witness. <u>Dows v Wood</u>, 211 F3d 480, 486 (9th Cir 2000). A defendant's mere speculation that a witness might have given helpful information if interviewed is not enough to establish ineffective assistance. See <u>Bragg v Galaza</u>, 242 F3d 1082, 1087 (9th Cir 2001), amended, 253 F3d 1150 (9th Cir 2001).

Broadway's claim that his counsel provided ineffective assistance by not investigating or calling witnesses to prove that Broadway was not a member of a street gang is without merit. The trial testimony extensively documented Broadway's street gang affiliation, both as a former Crip gang C-Mob member and Mount Pleasant Hoods (MPH) member. Broadway's mere speculation that family members or friends may have provided helpful testimony for the defense is insufficient. See id.

//
//
//

**13**

**2**

Broadway claims further that his counsel provided ineffective assistance by not moving to suppress evidence of Broadway's street gang activity. Broad Amend Pet, Claim 2 at ¶ 6. Hence, according to Broadway, the "jury was led to believe that [Broadway] was a member of a street gang based on the introduction of the predicated offenses of gang activity that was more attributed to co-defendants Corey Holes and Terrence Tyson, not [Broadway]." Id.

The Ninth Circuit has held that "[t]o show prejudice under <u>Strickland</u> from failure to file a motion, [petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to [petitioner]." <u>Wilson v Henry</u>, 185 F3d 986, 990 (9th Cir 1999).

In the instant case, Broadway's counsel's decision not to move to suppress evidence of Broadway's street gang activity was reasonable under the <u>Wilson</u> standard. The evidence presented at trial of Broadway's street gang activity was substantial. The superior court found that Broadway had "flip-flopped" from the Crip gang C-Mob to the Mount Pleasant Hoods (MPH). Detective Dunson identified Broadway and his co-defendants, Tyson and Holmes, as "hard core" MPH members. Broadway used gang terminology in initiating the instant conflict between the Bloods and the Crips. And, Broadway initially drove the vehicle containing Bloods' members who subsequently committed the crime.

//

This evidence was essential to the prosecution's case that as a criminal street gang member, Broadway had the specific intent to commit, encourage or facilitate criminal conduct. App Ct Affirm at 8. Only by proving specific intent could the prosecution prove Broadway guilty of attempted premeditated murder and assault with a firearm under an aider and abetter theory.

It simply cannot be said that if Broadway's counsel had moved to suppress this evidence, that the superior court would have reasonably granted the motion "as meritorious." See Wilson, 185 F3d 986, 990.

3

Broadway finally claims that his counsel provided ineffective assistance by not moving to dismiss the allegation of assault with a firearm and the charge of possessing a firearm. Broad Amend Pet, Claim 2 at ¶ 7. Broadway asserts that there were no allegations or evidence presented by the prosecution to support that Broadway assaulted any victims with a firearm or possessed a firearm. Id.

Under the Wilson standard, Broadway's final ineffective assistance claim also fails. In reviewing the jury's conviction of Broadway, the court of appeal explicitly stated: "Because we find sufficient evidence in the record to support [Broadway's] convictions for [one count of first degree attempted murder and two counts of assault with a firearm] on an aiding and abetting theory, we choose not to evaluate the evidence based upon a theory that [Broadway] was the direct perpetrator of the drive-by shooting." App Ct Affirm at 9 (emphasis added).

15

1       Under an aider and abettor theory, the prosecution did
2  <u>not</u> need to prove that Broadway possessed a firearm or assaulted
3  the victim with a firearm.  Hence, the prosecution did not need to
4  present evidence demonstrating that Broadway was the direct
5  perpetrator.  For this reason, a motion to dismiss the allegations
6  of assault and firearm possession would have been futile.
7       Broadway is not entitled to federal habeas relief on his
8  ineffective assistance of counsel claims.

10                                  IV
11      For the foregoing reasons, the petition for a writ of
12 habeas corpus is DENIED.  The clerk shall enter judgment in favor
13 of respondent and close the file.

15      IT IS SO ORDERED.

                                    /s/ Vaughn R Walker
18                                  VAUGHN R WALKER
                                    United States District Chief Judge